**Weil, Gotshal & Manges LLP**

2001 M Street, NW Suite 600
Washington, DC 20036
+1 202 682 7000 tel
+1 202 857 0940 fax

**Joshua M. Wesneski**
+1 (202) 682-7248
Joshua.Wesneski@weil.com

June 17, 2025

**VIA E-FILING**
Molly C. Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
James R. Browning Courthouse
95 7th Street
San Francisco, CA 94103

Re: *Schwartz v. Miller, et al.*, No. 23-1343 – Rule 28(j) Letter

Dear Ms. Dwyer:

Pursuant to Fed. R. App. P. 28(j), Appellant Paul Schwartz submits as supplemental authority this Court's recent Order denying rehearing en banc in *Watanabe v. Derr*, No. 23-15605 (9th Cir. June 5, 2025), attached as Exhibit A.

As explained in Appellant's October 10, 2024 letter (ECF No. 57), this Court's decision in *Watanabe* supports reversal. The panel in *Watanabe* held that a *Bivens* claim against Bureau of Prisons medical staff could proceed under the Eighth Amendment because it was materially indistinguishable from *Carlson v. Green*, 446 U.S. 14 (1980), and thus did not present a "new context." The Court rejected arguments similar to those raised by Appellee here, including that the relative severity of the constitutional violation and the existence of the Administrative Remedy Program did not create a new context for *Bivens* purposes. Answer Br. 30–31, 39.

The Court's denial of rehearing en banc confirms that *Watanabe* is the controlling law of this Circuit. In a statement respecting the denial of rehearing en banc, Judges Paez and Koh emphasized the panel's holding on those two crucial issues. Ex. A at 4–17. The statement reinforces that *Carlson* remains controlling and that the existence of administrative remedies is not, by itself, a special factor barring relief at step one. *See* Opening Br. 21–22; Reply Br. 13–24.

Respectfully Submitted,

/s/ *Joshua M. Wesneski*
Joshua M. Wesneski

*Counsel for Appellant Paul Schwartz*
cc: Counsel of Record

# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KEKAI WATANABE, | No. 23-15605 |
| *Plaintiff-Appellant*, | D.C. No. 1:22-cv-00168-JAO-RT |
| v. | |
| ESTELA DERR; K. ROBL, Mr.; NIELSEN, Nurse; KWON, Dr., | ORDER |
| *Defendants-Appellees*. | |

Filed June 5, 2025

Before: RICHARD A. PAEZ, MILAN D. SMITH, JR., and
LUCY H. KOH, Circuit Judges.

Order;
Statement by Judges Paez and Koh;
Dissent by Judge R. Nelson;
Dissent by Judge Collins

# SUMMARY[*]

## Prisoner Civil Rights

The panel denied a petition for panel rehearing and a petition for rehearing en banc in a case in which the panel reversed the district court's dismissal of a *Bivens* action brought by federal inmate Kekai Watanabe, who alleged that his Eighth Amendment rights were violated when the medical staff were deliberately indifferent to his serious medical needs.

Respecting the denial of rehearing en banc, Judge Paez and Judge Koh wrote that the majority opinion correctly concluded that under the two-step framework governing *Bivens* actions, Watanabe's Eighth Amendment deliberate indifference claims are cognizable. The claims arose from the same context as *Carlson v. Green*, 446 U.S. 14 (1980), and involved the same officer rank, type and specificity of official action, judicial guidance, governing legal mandate, and risk of disruptive intrusion by the Judiciary into the functioning of the other branches. And no other "meaningful" differences distinguish the context of Watanabe's claims from *Carlson*. The existence of alternative remedies, specifically the Bureau of Prisons' Administrative Remedies Program (ARP), does not place Watanabe's claim within a new context because the ARP existed when the Supreme Court decided *Carlson*. Moreover, alternative remedies like the ARP are not typically germane to the first step of the *Bivens* analysis,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

which examines the context of the constitutional violation itself—not the appropriate remedy for that violation. The severity of misconduct or injury that Watanabe alleged was not necessarily meaningfully less severe than the mistreatment at issue in *Carlson*. The majority opinion is in line with the Fourth, Fifth, Sixth, and Seventh Circuits in holding that *Carlson* actions remain viable. Because *Carlson* actions remain viable and because the majority opinion is in line with that decision and other post-*Bivens* decisions, the court properly declined to take this case en banc.

Dissenting from the denial of rehearing en banc, Judge R. Nelson, joined by Judges Callahan, M. Smith, Ikuta, Bennett, Bade, Lee, Bress, Bumatay and VanDyke, wrote that *Bivens* has been all but overruled. *Bivens* claims are available only if a plaintiff's allegations are effectively identical to one of the three cases in which the Court has acknowledged a *Bivens* remedy. If there is a single meaningful difference between a plaintiff's claim and a prior *Bivens* case, then the claim arises in a new *Bivens* context. The existence of alternative remedies should be considered at *Bivens* step one. Here, Watanabe's claim arose in a new *Bivens* context because the severity of Watanabe's allegations differed from *Carlson* and access to an alternative remedy, specifically, the ARP, was available to Watanabe but was unavailable to the plaintiff in *Carlson*. The majority's alternative remedies holding underscores a circuit split and defies circuit precedent.

Dissenting, Judge Collins agreed with Judge R. Nelson that this court should have taken this case en banc. He notes additionally that there is considerable tension between the Supreme Court's never-explicitly-overruled decision in *Carlson* and nearly everything else the Court has said about the scope of *Bivens* over the last many years. This case may

provide an opportunity for the Court to provide greater clarity as to what, if anything, is left of *Carlson*.

## ORDER

The petition for panel rehearing (Dkt. 54) is DENIED. A judge of the court requested a vote on en banc rehearing. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc rehearing. Fed. R. App. P. 40(c). Appellees' petition for rehearing en banc (Dkt. 54) is thus DENIED.

PAEZ and KOH, Circuit Judges, respecting the denial of rehearing en banc:

One who reads Judge Nelson's dissent from the denial of rehearing en banc might be tempted to believe that the majority opinion broke ground for new *Bivens* claims and ignored Supreme Court directives. On the contrary, Supreme Court and Ninth Circuit precedents support the result that the panel majority reached. This statement aims to correct the mischaracterizations—regarding the majority opinion and the state of the law—upon which Judge Nelson's dissent relies.

Under the two-step framework governing *Bivens* actions, Kekai Watanabe's Eighth Amendment deliberate indifference claims are cognizable because they arise from the same context as *Carlson v. Green*, 446 U.S. 14 (1980). *Watanabe* and *Carlson* involve the same officer rank, type and specificity of official action, judicial guidance, governing legal mandate, and risk of disruptive intrusion by

the Judiciary into the functioning of the other branches. *See Ziglar v. Abbasi*, 582 U.S. 120, 139-40 (2017). And importantly, no other "meaningful" differences distinguish the context of Watanabe's claims from *Carlson*. *See id*.

Judge Nelson's dissent asserts that two features of Watanabe's case distinguish it from *Carlson*: the Bureau of Prisons's Administrative Remedies Program (ARP), 28 C.F.R. § 542, and the severity of the alleged misconduct and injury. The ARP was in place when *Carlson* was decided and therefore does not create a "new" factual context. Moreover, alternative remedies like the ARP are not typically germane to the first step of the *Bivens* analysis, which examines the context of the constitutional violation itself—not the appropriate remedy for that violation. With respect to severity, Judge Nelson's dissent offers neither binding authority nor an adequate rationale establishing that a difference in severity can create a new *Bivens* context, as opposed to merely informing the merits of the constitutional violation. And regardless, the mistreatment that Watanabe alleges is not necessarily meaningfully less severe than the mistreatment at issue in *Carlson*.

In deciding this case, the panel majority adhered faithfully to Ninth Circuit and Supreme Court precedent. Although the circuits have split on the role of alternative remedies and the continued viability of *Carlson* actions, that split predated the majority opinion and would have persisted regardless of en banc rehearing.

## I.

### A.

The existence of the ARP does not place Watanabe's claim within a new context because it already existed when

the Supreme Court decided *Carlson*. The final rule creating the ARP was published and became effective in October and November of 1979, while *Carlson* was decided in 1980. *See* Administrative Remedy Program, 44 Fed. Reg. 62,250 (Oct. 29, 1979) (to be codified at 28 C.F.R. § 542). Although the program has been amended since, those changes did not alter its nature or basic mechanisms. *See, e.g.*, Administrative Remedy Program, 61 Fed. Reg. 88 (Jan. 2, 1996) (to be codified at 28 C.F.R. § 542).

In laying out the first step of its two-step *Bivens* analysis, *Ziglar* instructs courts to evaluate whether a "case is different in a meaningful way from previous *Bivens* cases" to determine whether the context is "new." 582 U.S. at 139. Because the ARP was in place when *Carlson* was decided, it cannot be a "meaningful difference" or make for a "new" context.[1]

## B.

The majority opinion in *Watanabe* does not hold that alternative remedies like the ARP can never be considered at step one, but only that "the existence of alternative remedial structures does not render this case a new context." *Watanabe v. Derr*, 115 F.4th 1034, 1042 (2024). That

---

[1] Judge Nelson's dissent asserts that "[this], of course, is not the test," because courts must instead examine "special factors that previous *Bivens* cases *did not consider*." R. Nelson Dissent 28. But a "special factor that previous *Bivens* cases did not consider" is only relevant if it constitutes a difference between contexts. *Ziglar*, 582 U.S. at 139-40 ("A case might differ in a meaningful way because of . . . the presence of potential special factors that previous *Bivens* cases did not consider."). In other words, a case does not meaningfully differ from a previous *Bivens* case just because the Supreme Court did not address a common feature between the instant case and the previous *Bivens* case. To hold otherwise would eviscerate those original *Bivens* cases.

alternative remedies are generally not relevant at step one, however, is supported by the structure of the *Ziglar* two-step analysis. *Ziglar*'s first step requires courts to ask whether any "meaningful differences" distinguish the case from one of the original three *Bivens* cases. 582 U.S. at 139. Meaningful differences might include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 139-40. If the case does not meaningfully differ from one of the three recognized *Bivens* contexts, then the plaintiff has a damages remedy under that precedent. *Id.* If the case does differ, the court must then consider whether "there are special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* at 136 (cleaned up). This second step focuses on "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.*

"Special factors" can therefore be considered at both steps, but the meaning of the term takes on a different focus when moving from the first step to the second. At the first

step, courts consider special differentiating factors that previous *Bivens* cases did not consider; at the second, courts consider "special factors counselling hesitation" in the absence of congressional action.

The difference between step one and step two shows why alternative remedies take on greater significance at step two. Step one focuses on the alleged violation, including the nature of the right violated, the mechanism of harm, the identity of the federal official and the guidance available to that official, and the factual and legal context shaping how the alleged violation should be understood and interpreted. *See Ziglar*, 582 U.S. at 139-40. Step two, by contrast, focuses on remedies. In asking whether the judiciary is best equipped to provide a remedy, it considers, among other matters, whether Congress or the Executive has already done so. *See Egbert v. Boule*, 596 U.S. 482, 492-93 (2021). While the two steps may overlap or collapse, they nonetheless refer to distinct analyses. *See id.* And when alternative remedies are unrelated to the official's conduct, the constitutional right allegedly violated, or the legal framework governing the challenged action, they bear little significance at step one, which focuses on the context of the violation itself.

The Supreme Court has considered alternative remedies only when deciding whether to extend *Bivens* to a new context (step two). *See Watanabe*, 115 F.4th at 1042 (noting that *Egbert* "clarified that the existence of alternative remedial structures can be one 'special factor' to be considered at the *second* step of the *Bivens* analysis"). In *Ziglar*, the Court laid out a comprehensive *Bivens* framework without suggesting that alternative remedies, such as the ARP, generally have a role at step one. *See* 582 U.S. at 136-37, 139-40. *Ziglar* consistently treated alternative remedies as step-two special factors. For

instance, the Court stated that "the existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." *Id*. at 148. This language refers to step two because courts are not called upon to authorize a new remedy at step one; at step one, the remedy has already been authorized by *Bivens*, *Davis*, or *Carlson*.[2]

Judge Nelson's dissent asserts that the ARP is a step-one "special factor that previous *Bivens* cases did not consider" because the *Carlson* plaintiff, who was the deceased inmate's mother, "could not herself utilize the ARP as an alternative remedy against the prison officials alleged to have unconstitutionally caused her son's death." R. Nelson Dissent 26-27. But if this distinction were meaningful, the Supreme Court would have noted it when considering the conditions-of-confinement claims brought by the *Ziglar* plaintiffs, who analogized to *Carlson* and to whom the ARP was available. *See* 582 U.S. at 147.

And more importantly, the fact that the *Carlson* plaintiff could not herself use the ARP is irrelevant under the

---

[2] Judge Nelson's dissent interprets this portion of the *Ziglar* opinion as considering alternative remedies as part of a step-one analysis. R. Nelson Dissent 25-26. We understand this passage as identifying a new context at step one, discussing the role that alternative remedies and the PLRA might play in a step-*two* analysis, and then remanding for the Court of Appeals to perform that analysis in the first instance. *See Ziglar*, 582 U.S. at 147-49. This interpretation is supported by the fact that the Court expressed uncertainty regarding the available alternative remedies ("there *might* have been alternative remedies available") and then instructed the Court of Appeals to identify those remedies and apply them at step two ("the Court of Appeals should have . . . analyzed whether there were alternative remedies available or other 'sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy' in a suit like this one"). *Id*. at 148-49 (emphasis added).

Supreme Court's approach to alternative remedies. The Supreme Court has repeatedly made clear that alternative remedies are only relevant to *Bivens* claims because Congressional or Executive policymaking informs the appropriateness of a judicial remedy. *See Egbert*, 596 U.S. at 493, 498. Whether the alternative remedy affords adequate or substitute relief to the plaintiff is not relevant. *Id*. at 493. Thus, to the extent that the ARP represents the Executive's judgment about how prisoner complaints concerning their medical care should be addressed (i.e., the appropriate remedial scheme for deterring officer misconduct in that area), the ARP was as relevant in *Carlson* as it is in *Watanabe*. *See id*. And because *Carlson* afforded a remedy despite the existence of the ARP, the ARP is not a step-one special factor creating a new context in *Watanabe*.

Judge Nelson's dissent asserts that "the fact that the mother in *Carlson* could not use a remedy that was available to Watanabe" constitutes a "meaningful difference." R. Nelson Dissent 28. But the availability, effectiveness, or adequacy of an alternative remedy to a particular plaintiff is expressly irrelevant to the analysis of *Bivens* claims under Supreme Court precedent. *Egbert*, 596 U.S. at 493 ("Importantly, the relevant question is not whether a *Bivens* action would 'disrup[t]' a remedial scheme or whether the court 'should provide for a wrong that would otherwise go unredressed.' Nor does it matter that 'existing remedies do not provide complete relief.'" (internal citations omitted)).

## C.

Contrary to Judge Nelson's dissent, *Harper v. Nedd* does not conflict with the *Watanabe* majority opinion. *See* R. Nelson Dissent 38. *Harper* presented an exception to the principle that alternative remedies are generally significant

at step two, not step one. *Harper* held that the alternative remedies afforded by the Civil Service Reform Act (CSRA)[3] made for a new *Bivens* context where the plaintiff alleged that officials violated his right to due process as they performed their duties in affording him those remedies. 71 F.4th 1181, 1187 (9th Cir. 2023). In *Harper*, unlike in *Watanabe*, the "alternative remedial structures" were inextricable from the constitutional violation and therefore properly considered at step one. And because *Watanabe* did not hold that alternative remedies could never be relevant at step one, the cases do not conflict. 115 F.4th at 1042.

Harper, a former Bureau of Land Management (BLM) ranger, argued that Department of the Interior and BLM officials violated his Fifth Amendment due process rights as he pursued the CSRA's remedial procedures to address adverse employment actions taken against him. 71 F.4th at 1183-84; *see id*. at 1188 (noting that Harper "alleged that Defendants took 'ultra vires actions' that 'corrupted' the CSRA process and violated his Fifth Amendment rights"); *id.* at 1187 n.1 (noting that Harper alleged "that Defendants conspired to deprive him of an appeal to the [Merit Systems Protection Board].").

As we observed throughout *Harper*, "the CSRA guides the Executive Branch in addressing disciplinary disputes" like Harper's. *Id*. at 1188. The *Harper* opinion made clear that the CSRA was relevant because it constituted a distinct

---

[3] The CSRA is a comprehensive legal scheme governing federal employment. *See* Civil Service Reform Act of 1978 (CSRA), Pub. L. 95-454, 92 Stat. 1111 (1978) (codified in various sections of 5 U.S.C.); *id.* § 4303 (requiring detailed notice of and opportunities to challenge adverse employment actions based on unacceptable performance); *id.* § 7501 (allowing an employee to be suspended without pay for 14 days, as Harper was); *id.* §§ 7512, 7513(d), 7703(b)(1) (appeal procedures).

"statutory or other legal mandate under which the officer was operating." *Id*. at 1187. The CSRA was part and parcel of Harper's alleged violation. By contrast, Watanabe complained of conduct entirely separate from the administration of the ARP. The ARP was not inextricable from the alleged constitutional violation, as in *Harper*. It is not then appropriately considered at the first step of the *Bivens* analysis, which focuses on the context of the alleged violation.

## II.

Judge Nelson's dissent argues that the severity of misconduct or injury in Watanabe's case created a new context from *Carlson*. R. Nelson Dissent 31-34. But when a federal prisoner alleges deliberate indifference to his serious medical needs, severity informs the merits of the constitutional claim. If the prison official's conduct is not so severe as to rise to the level of deliberate indifference, or if the plaintiff's injuries are not so severe as to suggest that his medical needs were serious, then the claim fails. Otherwise, any attempt to distinguish a *Carlson* claim based on the severity of the injury or misconduct requires arbitrary line-drawing which has no basis in the *Bivens* doctrine. *See Brooks v. Richardson*, 131 F.4th 613, 615 (7th Cir. 2025) (Easterbrook, J.) ("As for the duration of the poor care or the gravity of the condition: these seem more pertinent to the merits than to determining the scope of the holding in *Carlson*."). "To conclude that a claim extends *Carlson* because it is weaker than the claim in *Carlson* is to undermine *Carlson* itself—the very thing the Supreme Court has asked us not to do." *Waltermeyer v. Hazlewood*, 136 F.4th 361, 371 (1st Cir. 2025) (Breyer, J., dissenting).

In arguing that Watanabe's context is new because it involved less severe mistreatment, Judge Nelson relies on the First Circuit's *Waltermeyer v. Hazlewood*. But *Waltermeyer* proves our point: while the court found a new context because of the lesser severity of the alleged misconduct, it observed that the alleged conduct was so minor that it did not constitute a violation of the Eighth Amendment at all. For his knee pain, Waltermeyer "received multiple types of non-surgical medical treatments," including "bi-annual cortisone injections (although he wanted to receive the injections every month), pain medication, special shoes, knee braces, access to a low bunk, and a cane." *Id*. at 365. Waltermeyer's claims did not involve "gross inadequacy" of care. *Id*. at 366. Rather, Waltermeyer was treated extensively in accordance with doctors' recommendations, and the only dispute over his medical care was that he preferred a different treatment which was neither recommended by a consulting physician nor indicated by his MRI results. *Id*. at 366-67. The court therefore found that "[t]here was no deliberate indifference analogous to *Carlson*." *Id*. at 367. *Waltermeyer* stands for the proposition that allegations that do not establish a constitutional violation are not actionable under *Bivens*, but the opinion has less relevance to claims where the allegations are severe enough to violate the Eighth Amendment.

Judge Nelson's dissent suggests that *Ziglar* established a role for severity in distinguishing a new context. R. Nelson Dissent 32. But *Ziglar*'s observation that the detainees' injuries were "just as compelling" as those in *Carlson* does not imply that severity alone can constitute a sufficiently "meaningful" difference to create a new context. *See Ziglar*, 582 U.S. at 146-47. Moreover, in finding that the claims in *Ziglar*, which involved systematic abuse of hundreds of

detainees, were "just as compelling" as the *Carlson* plaintiff's death by asthma attack, *Ziglar* analyzed severity at a remarkably high level of generality. Although the harms in *Carlson* and *Ziglar* were nothing alike, the Court still found them to be "parallel." *Id.* at 147. Surely, the compelling nature of the injury differs less between *Carlson* and *Watanabe* than between *Carlson* and *Ziglar*.[4]

### III.

Although we acknowledge a circuit split on the continued viability of *Carlson* actions, our opinion neither created nor deepened that split. The majority opinion in *Watanabe* joined the Sixth Circuit in holding that the ARP does not distinguish *Carlson* actions at step one. *Watanabe* is also aligned with the Fourth, Fifth, and Seventh Circuits, all of which recently upheld *Carlson* claims.

*Johnson v. Terry*, which Judge Nelson's dissent highlights, stands alone in foreclosing a *Carlson* action for deliberate medical indifference based on the existence of the ARP. 119 F.4th 840, 858-61 (11th Cir. 2024). Counterbalancing the Eleventh Circuit is the Sixth, which explicitly holds that under *Carlson*, "prisoners may bring Eighth Amendment claims against prison officials despite the existence of the ARP," noting that "the ARP, which has been in effect for nearly four decades . . . did not affect the Supreme Court's conclusion in *Carlson*." *Koprowski v. Baker*, 822 F.3d 248, 256-57 (6th Cir. 2016). This decision

---

[4] Even if severity could distinguish a new context, the wrongful conduct and injuries Watanabe suffered were not meaningfully less severe than those in *Carlson*. The treating nurse found Watanabe—at a minimum— to have spasms, warmth to the touch, tenderness, and pain at a level ten. The nurse provided no meaningful treatment despite Watanabe's repeated pleas over several months.

predated *Ziglar*, which clarified the Supreme Court's strict approach to *Bivens*. However, three years after *Ziglar*, the Sixth Circuit confirmed its holding, writing that its earlier decision in *Koprowski* had "observed . . . that the grievance system's existence did not suffice to reject a *Bivens* claim already in existence." *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 525 (6th Cir. 2020).

The Seventh Circuit also diverged from the Eleventh in *Brooks v. Richardson*. In *Brooks*, the court reversed the dismissal of claims under *Carlson* arising from prison officials' misdiagnosis and failure to treat appendicitis, which caused the plaintiff to suffer a ruptured appendix and peritonitis. 131 F.4th at 614. In deciding *Brooks*, the Seventh Circuit was presented with—and evidently rejected—the argument that the ARP created a new context at step one. *See* Brief of Defendants-Appellees, *Brooks v. Richardson*, 2024 WL 4291216, at *12, 20.

The Fourth and Fifth Circuits have also upheld *Carlson* actions post-*Ziglar* and post-*Egbert*. The Fourth Circuit's unpublished *Masias v. Hodges* found a *Bivens* remedy available to a plaintiff alleging an inadequately treated ankle injury, nasal infection, and hernia, reversing the district court's finding of a new context on the basis of severity. No. 21-6591, 2023 WL 2610230, at *1-2 (4th Cir. Mar. 23, 2023). *Masias* relied on *Langford v. Joyner*, 62 F.4th 122, 126-27 (4th Cir. 2023), which evaluated a *Bivens* complaint for deliberate indifference to medical needs involving a bowel obstruction and abdominal infection. *Id*. at *2.

Similarly, the Fifth Circuit's *Vaughn v. Bassett* addressed deliberate medical indifference concerning an inmate's facial injuries sustained during a softball match, finding the context was the same as *Carlson* despite minor

factual differences. No. 22-10962, 2024 WL 2891897, at *1, 4 (5th Cir. June 10, 2024) (unpublished). In doing so, it relied on several published decisions including *Carlucci v. Chapa*, 884 F.3d 534 (5th Cir. 2018). *Id*. at *5. *Carlucci* held that the plaintiff stated a plausible claim for relief when prison officials did not provide oral surgery to prevent the plaintiff's teeth from hitting each other and breaking or cracking. 884 F.3d at 539.

Because these circuits each resolved the propriety of the *Bivens* claim at step one, they had no reason to discuss the ARP, which is not typically a step-one special factor in a *Carlson* action. But in upholding *Carlson* actions post-*Ziglar*, each of these circuits has adopted a position which affords virtually no role for the ARP in making a new context at step one.

IV.

Despite the accusations in Judge Nelson's dissent, the majority opinion correctly concluded that Watanabe's claims are identical in every meaningful way to the claims in *Carlson*. This conclusion is unaffected by the ARP, which existed when *Carlson* was decided. Moreover, *Ziglar* and *Egbert* suggest consideration of alternative remedies, in the ordinary case and within the context of *Carlson*, only at step two. Lesser severity, on the other hand, may foreclose a *Bivens* action where the claims do not establish a constitutional violation, but that is not the case here.

The majority opinion is in line with the Fourth, Fifth, Sixth, and Seventh Circuits in holding that *Carlson* actions remain viable. The Supreme Court itself has likewise declined to undermine the viability of the original *Bivens* trio. *See, e.g.*, *Ziglar*, 582 U.S. at 134; *Egbert*, 596 U.S. at 502. Even if the reasoning of *Ziglar* and *Egbert* undercuts

*Carlson*—because of the ARP or any other factor—we should not rush to effectively overrule Supreme Court precedent. *See Hohn v. United States*, 524 U.S. 236, 252-53 (1998) (holding that decisions of the Supreme Court "remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality"). Because *Carlson* actions remain viable and because the majority opinion is in line with that decision and other post-*Bivens* decisions, the court properly declined to take this case en banc.

---

R. NELSON, Circuit Judge, joined by CALLAHAN, M. SMITH, IKUTA, BENNETT, BADE, LEE, BRESS, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court recognized for the first time an implied cause of action for a constitutional violation by federal officials. The Supreme Court has not recognized a new *Bivens* claim in 45 years. To the contrary, *Bivens* has been all but overruled. Time and again, the Supreme Court has urged caution in recognizing *Bivens* claims for damages against federal officials. *See Egbert v. Boule*, 596 U.S. 482, 491 (2022); *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020); *Ziglar v. Abbasi*, 582 U.S. 120, 139 (2017). *Bivens* claims are available only if a plaintiff's allegations are analogous to one of three cases in which the Court has acknowledged a *Bivens* remedy. *See Bivens*, 403 U.S. at 389; *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980). If a plaintiff's claim is effectively identical to one of these cases, then a cause of action is available under *Bivens*. But if there

is a single meaningful difference between a plaintiff's claim and a prior *Bivens* case, then the claim arises in a "new *Bivens* context." *Ziglar*, 582 U.S. at 139. At that point, a court must consider whether it can extend *Bivens* to encompass the claim.

Most courts follow the Supreme Court's directive and rarely recognize *Bivens* claims. Until the majority's decision, even the Ninth Circuit—which has become famous for repeatedly ignoring the Supreme Court on *Bivens* questions—seemed to get the message. In the last three years, we have rejected *Bivens* claims in eight published opinions (and even more in unpublished dispositions). *See, e.g.*, *Harper v. Nedd*, 71 F.4th 1181, 1184 (9th Cir. 2023). The majority opinion reverts to a sad time in our court's bygone history where we breathed life into *Bivens*—again and again—even when the Supreme Court told us to stop. *See, e.g.*, *Egbert*, 596 U.S. at 486; *Minneci v. Pollard*, 565 U.S. 118, 122 (2012); *Hui v. Castaneda*, 559 U.S. 799, 812–13 (2010); *Schweiker v. Chilicky*, 487 U.S. 412, 419–20 (1988); *Chappell v. Wallace*, 462 U.S. 296, 298 (1983); *see also FDIC v. Meyer*, 510 U.S. 471, 484 (1994) ("We know of no Court of Appeals decision, other than the Ninth Circuit's below, that has implied a *Bivens*-type cause of action directly against a federal agency."). Add this case to the infamous list—which should have had its last entry years ago.

The *Bivens* analysis requires a two-step inquiry. It's the first step—the new context analysis—where most of the action occurs. The Court's "understanding of a 'new context' is broad," *Hernandez*, 589 U.S. at 102, and the requirements for identifying a new context are "easily satisfied," *Ziglar*, 582 U.S. at 149. The majority opinion, against a compelling dissent by Judge M. Smith, turns that

guidance on its head.  It holds that a plaintiff's access to alternative remedies, meaning remedies besides money damages, does not create a new *Bivens* context.  That is true, the panel majority holds, even when such remedies were not considered in the Court's previous *Bivens* cases.  The majority's holding is wrong—not only under Supreme Court precedent, but also our own.  What's more, the majority recognizes a circuit split, *see* Statement at 14, diverging from at least two other circuits which consider the availability of alternative remedies as part of the new context analysis.  The en banc court should have fixed the majority's error.  Because we didn't, the Supreme Court will hopefully resolve the multiple deep circuit splits over *Carlson*-related *Bivens* actions.  *See infra*, at 32, 35; Collins Dissent at 41, 45.  The majority's statement underscores the need for Supreme Court review, recognizing the inter-circuit tension on the availability of Eighth Amendment claims under *Bivens*.  *See* Statement at 14–16.  I dissent from our court's decision to let this case pass.

## I

## A

Under 42 U.S.C. § 1983, a plaintiff may seek damages from a state official who, while acting under color of state law, violated a federal constitutional right.  *See Monroe v. Pape*, 365 U.S. 167, 171–87 (1961).  Congress has never enacted an analogous statute for constitutional claims against federal officials.

Still, in *Bivens*, the Supreme Court created for the first time an implied cause of action against federal officials for unreasonable searches and seizures under the Fourth Amendment.  403 U.S. at 396–97.  Over the next decade, the Court expanded *Bivens* to create two more implied damages

claims. The first, a sex discrimination claim by a former congressional staffer under the Fifth Amendment's Due Process Clause, came in *Davis*, 442 U.S. at 248–49. Then, in *Carlson*, the Court created an Eighth Amendment inadequate-care claim against federal prison officials who failed to treat an inmate's asthma, leading to his death. 446 U.S. at 16 n.1, 17–19.

The Court has since refused to extend *Bivens* further. Over time, the Court has "come to appreciate more fully the tension between judicially created causes of action and the Constitution's separation of legislative and judicial power." *Egbert*, 596 U.S. at 491 (internal quotation marks omitted). Indeed, in the 45 years since *Carlson*, the Court has declined to recognize a *Bivens* claim in 12 cases. *See Harper*, 71 F.4th at 1185 (citing *Tate v. Harmon*, 54 F.4th 839, 843 (4th Cir. 2022)). In the last three, it confirmed that "the heady days in which the Court assumed common-law powers to create causes of action" are long gone. *Egbert*, 596 U.S. at 491 (cleaned up); *see also Hernandez*, 589 U.S. at 99–101; *Ziglar*, 582 U.S. at 138–40. Yet the doctrine narrowly lives on in theory—though expanding *Bivens* is "a disfavored judicial activity." *Egbert*, 596 U.S. at 491 (quotation omitted).

When faced with a proposed *Bivens* claim, our analysis boils down to two steps. At step one, we ask whether the plaintiff's claim presents "a new *Bivens* context." *Id.* at 492 (quoting *Ziglar*, 582 U.S. at 139). A context is "new" if the case is "different in a meaningful way" from the Court's three previous *Bivens* cases. *Ziglar*, 582 U.S. at 139. To aid in that inquiry, *Ziglar* provided a non-exhaustive list of differences meaningful enough to make a given context new. *Id.* at 139–40. For example, "[a] case might differ in a meaningful way because of the rank of the officers involved;

the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; [or] the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Id.* A new context also arises with "the presence of potential special factors that previous *Bivens* cases"— *Davis*, *Carlson*, and *Bivens* itself—"did not consider." *Id.* at 140.

If a claim arises in a new context, we move to step two. There, we look for any "'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 136). Put simply, we ask if there is "reason to pause before applying *Bivens* in a new context." *Hernandez*, 589 U.S. at 102. If so, "we reject the request." *Id.*

Most recently, the Court clarified that the two steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 596 U.S. at 492. "[I]f there is any reason to think that 'judicial intrusion' into a given field might be 'harmful' or 'inappropriate,'" or "even if there is the '*potential*' for such consequences, a court cannot afford a plaintiff a *Bivens* remedy." *Id.* at 496 (first quoting *United States v. Stanley*, 483 U.S. 669, 681 (1987); then quoting *Ziglar*, 582 U.S. at 140).

## B

Kekai Watanabe was a federal inmate at a detention center in Honolulu, Hawaii. In 2021, he was beaten by rival gang members with an improvised weapon known as a "lock

in a sock." Once order was restored, about 20 inmates—Watanabe included—were placed in solitary confinement. Prison officials recorded Watanabe's "known or visible" injuries and referred him to sick call, but they did not take him to the hospital.

Several days later, Watanabe was evaluated by defendant Francis Nielsen, a nurse at the prison. Medical records indicate that Watanabe told Nielsen he was experiencing lower back pain, rating the pain as a "10." While Watanabe appeared "irritable" and "distressed," the results of his physical examination were mostly "normal." Nielsen consulted an on-call provider, entered new medication orders for an intramuscular injection and over-the-counter painkillers, encouraged gentle stretching, and told Watanabe to follow up with sick call. Yet Watanabe alleges that Nielsen did not offer any treatment and instead told him "to stop being a cry baby." Nielsen allegedly declined Watanabe's request to go to the hospital.

Watanabe remained in solitary confinement for two months. He alleges that he submitted multiple requests for medical attention, most of which were ignored, and that the attention he did receive "was limited to over the counter pain medication." Months later, Watanabe was diagnosed with a fractured coccyx with bone chips in the surrounding soft tissue. At that point, prison officials agreed to refer Watanabe to a specialist.

Soon after, Watanabe sued Nielsen and other BOP officials, alleging that they violated the Eighth Amendment through their deliberate indifference to his serious medical needs. Watanabe sought $3 million in damages and injunctive relief directing the warden "to follow United States law regarding the housing of federal inmates."

Ultimately, the district court agreed with Nielsen that Watanabe did not have a valid cause of action under *Bivens*. Applying the Supreme Court's two-step framework, the district court held that because Watanabe's claim was meaningfully different from the Eighth Amendment claim in *Carlson*, his claim arose in a new *Bivens* context.

As part of that analysis, the district court explained that Watanabe had access to alternative remedies that were not considered in *Carlson*—here, the Federal Bureau of Prisons' Administrative Remedy Program (ARP). *See* 28 C.F.R. § 542.10(a) ("The purpose of the [ARP] is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement."); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (the ARP "provides yet another means through which allegedly unconstitutional actions and policies can be brought to the attention of [prison officials] and prevented from recurring"). The availability of alternative remedies confirmed that Watanabe's claim arose in a new *Bivens* context. The district court then found that the ARP and other special factors counseled against extending *Bivens* to cover Watanabe's claim.

## C

The panel majority reversed, holding that Watanabe's claim was in all meaningful respects identical to *Carlson*. *Watanabe v. Derr*, 115 F.4th 1034, 1039 (9th Cir. 2024). The majority ticked through *Ziglar*'s new context factors, noting several similarities to the Eighth Amendment claim alleged in *Carlson*. *Id.* (citing *Ziglar*, 582 U.S. at 139–40). But when the majority reached the final *Ziglar* factors—including the "presence of potential special factors that previous *Bivens* cases did not consider"—it veered off course. *See Ziglar*, 582 U.S. at 140.

First, the majority likened the severity of Watanabe's allegations to *Carlson*, which involved the death of a chronically asthmatic inmate who was administered contra-indicated drugs and hooked up to a respirator that medical personnel knew to be broken. *Carlson*, 446 U.S. at 16 n.1. Even if "Watanabe received less deficient care" than the inmate in *Carlson*, the majority reasoned, it was "not a meaningful difference" giving rise to a new *Bivens* context. *Watanabe*, 115 F.4th at 1042.

Second, and more important for our purposes, the majority held that Watanabe's access to the ARP "does not render this case a new context." *Id.* According to the majority, the Supreme Court "clarified" in *Egbert* that alternative remedies "can be one 'special factor,' to be considered at the *second* step of the *Bivens* analysis," but not the first. *Id.* (emphasis in original) (citing *Egbert*, 596 U.S. at 493, 498). All this considered, the majority held that Watanabe's claim fell within an existing *Bivens* context, and thus "no further analysis [was] required." *Id.* at 1043 (quoting *Lanuza v. Love*, 899 F.3d 1019, 1023 (9th Cir. 2018)).

Judge M. Smith dissented in part. Noting that the Supreme Court's "understanding of a 'new context' is broad," the dissent explained how dissimilarities in the degree of mistreatment and severity of medical need distinguished this case from *Carlson*. *Id.* at 1045–46 (M. Smith, J., concurring in part and dissenting in part) (quoting *Hernandez*, 589 U.S. at 102). For example, Nielsen's initial examination of Watanabe mostly revealed results "within normal limits." *Id.* at 1045. Had Nielsen known of Watanabe's broken coccyx and still refused to send him to a hospital, "this case would look closer to *Carlson*." *Id.* But because Watanabe's allegations were meaningfully

different from those in *Carlson*, Judge M. Smith concluded that Watanabe's claim landed outside the preexisting *Bivens* framework.[1]

## II

The question is a simple one: May courts consider alternative remedies at *Bivens* step one?  Supreme Court precedent, decisions from other circuits, and our own *Bivens* case law show that the answer is a straightforward "yes."

## A

Start with the Supreme Court's decision in *Ziglar*. There, the Court considered whether *Bivens* covered the plaintiffs' claim that the warden of a federal prison violated the Fifth Amendment through his deliberate indifference to alleged prisoner abuse.  582 U.S. at 146–47.  The "first question" was whether the plaintiffs' claim "arises in a new *Bivens* context."  *Id.* at 147.  The Court noted "significant parallels" to *Carlson*.  *Id.*  But the Court recognized that a case can still "present a new context for *Bivens* purposes . . . if there are potential special factors that were not considered in previous *Bivens* cases."  *Id.* at 148.

What the Court said next dooms the majority's alternative remedies holding.  *Ziglar* concluded that the new context inquiry was satisfied, in part because the plaintiffs' claim presented "certain features that were not considered in the Court's previous *Bivens* cases and that might discourage a court from authorizing a *Bivens* remedy."  *Id.*  One of those features was "the existence of alternative remedies."  *Id.* ("[T]here might have been alternative remedies available

---

[1] Watanabe conceded that he cannot prevail at *Bivens* step two.  *See* Oral Arg. at 6:04–6:10.  So the sole issue here was whether Watanabe's claim presented a new *Bivens* context.  *Cf. Lanuza*, 899 F.3d at 1023.

here, for example, a writ of habeas corpus; an injunction requiring the warden to bring his prison into compliance with [federal regulations]; or some other form of equitable relief." (internal citations omitted)).  The Court noted that the "differences between [the plaintiffs'] claim and the one in *Carlson* are perhaps small, at least in practical terms." *Id.* at 149.  But the new context inquiry was still "easily satisfied" because the differences identified—the availability of alternative remedies, among others—were "meaningful ones." *Id.*  Having identified a new context, the Supreme Court left it to the lower courts on remand to decide whether to extend *Bivens* at step two to encompass the plaintiffs' claim.[2] *Id.*

It follows from *Ziglar* that the majority's cabining of alternative remedies to *Bivens*' second step cannot be correct.  By pointing to alternative remedies as an indication of a new *Bivens* context, *Ziglar* shows that such remedies are relevant at *both* steps of the *Bivens* analysis, not just the second.

Under that common-sense approach, Watanabe's claim arises in a new *Bivens* context.  Everyone agrees that his case is closest to *Carlson*.  But *Carlson* did not consider the ARP.  Why?  Because the plaintiff—the administratrix of her deceased son's estate—could not herself utilize the ARP as an alternative remedy against the prison officials alleged to have unconstitutionally caused her son's death.  *See* Bureau of Prisons, Control, Custody, Care, Treatment, and

---

[2] According to the majority, *Ziglar*'s discussion of alternative remedies simply previewed how such remedies "might play" in a step two analysis.  Statement at 9 n.2.  I would take the Justices at their word: "[T]he Court declines to perform the [step two] special-factors analysis itself." *Ziglar*, 582 U.S. at 149.

Instruction of Inmates, 44 Fed. Reg. 62,248, 62,250 (Oct. 29, 1979) (to be codified at 28 C.F.R. pts. 542, 544) ("This procedure applies to all inmates confined in Bureau of Prisons institutions . . . ."); *see also Fields v. Fed. Bureau of Prisons*, 109 F.4th 264, 274 (4th Cir. 2024) (noting that an "inmate's estate could not itself file a grievance through the ARP process"). *Carlson*, like *Bivens*, was a case of "damages or nothing." *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in the judgment). Put differently, an alternative remedy available to Watanabe was unavailable to the plaintiff in *Carlson*. If that is not a meaningful difference, then it's hard to say what is. *See Ziglar*, 582 U.S. at 139–40.

Consider too that *Carlson* did not evaluate alternative remedies as the Court does now. *See* Collins Dissent at 42, 45. In *Carlson*, the Court asked whether there were "alternative remed[ies] which [Congress] explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective," and it concluded that the Federal Tort Claims Act did not meet that standard. 446 U.S. at 18–19 (emphasis in original). Today, we do not consider whether an alternative remedy is an effective substitute for a *Bivens* action. *Egbert*, 596 U.S. at 498. The analysis is far simpler: "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id.* The Court's shift in how it understands alternative remedies is critical. As *Egbert* made clear, "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances' with *Bivens*, [*Davis*], or *Carlson* unless he also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law." *Id.* at 501 (quoting *Ziglar*, 582 U.S. at 139). Because an alternative remedy was available to

Watanabe, and because *Carlson* did not consider such remedies under the current framework, Watanabe's case is meaningfully different from *Carlson*.

The majority offers two responses in its statement respecting the denial of rehearing en banc. First, it notes that an early form of the ARP existed when *Carlson* was decided in 1980. We are told that the ARP therefore cannot create a "new" context. Statement at 5–6. That, of course, is not the test. Under *Egbert*, "a new context arises when there are 'potential special factors that previous *Bivens* cases *did not consider*.'" 596 U.S. at 492 (quoting *Ziglar*, 528 U.S. at 140) (emphasis added). For reasons explained, *Carlson* did not consider the ARP, even though the program existed when the case was decided.

Second, the majority maintains that the *Carlson* plaintiff's inability to use the ARP is "irrelevant" because "Congressional or Executive policymaking informs the appropriateness of a judicial remedy." Statement at 9–10. "Whether the alternative remedy affords adequate or substitute relief to the plaintiff is not relevant," the majority says. Statement at 10. I agree with all of that. But not with what follows: "[T]o the extent that the ARP represents the Executive's judgment about how prisoner complaints concerning their medical care should be addressed . . . the ARP was as relevant in *Carlson* as it is in *Watanabe*." *Id.* The problem for the majority is that *Carlson*, unlike *Watanabe*, did not involve a prisoner complaint about his medical care. It involved a mother suing on behalf of her deceased son's estate. And if the question is whether there is a single meaningful difference between *Carlson* and this case, the fact that the mother in *Carlson* could not use a remedy that was available to Watanabe easily meets that bar.

Putting aside the majority's belated attempt to justify its holding, its actual opinion offered little reasoning for departing from *Ziglar* and its endorsement of considering alternative remedies at step one. The majority devoted one sentence to why it understood alternative remedies as relevant only at *Bivens* step two. To hear the majority tell it, *Egbert* "clarified" that alternative remedies can be one special factor "to be considered at the *second* step of the *Bivens* analysis." *Watanabe*, 115 F.4th at 1042 (emphasis in original) (citing *Egbert*, 596 U.S. at 493, 498). But *Egbert* did the opposite. The Court never said that alternative remedies cannot be considered at *Bivens* step one. Its entire step one analysis of the plaintiff's Fourth Amendment claim consisted of flagging the Ninth Circuit's concession that the claim "presented a new context for *Bivens* purposes." *Egbert*, 596 U.S. at 494.

While the *Egbert* Court considered alternative remedies at step two in declining to extend the plaintiff's claim to a new context, nothing about that forecloses consideration of alternative remedies at step one as well. Just one meaningful difference is enough to create a new *Bivens* context. *See Ziglar*, 582 U.S. at 139; *see also Tate*, 54 F.4th at 846 ("The Supreme Court has instructed not only that 'new context' must be understood broadly but also that a new context may arise if *even one* distinguishing fact has the potential to implicate separation-of-powers considerations." (citing *Egbert*, 596 U.S. at 494–96)). So the fact that a case does not discuss alternative remedies at step one, but does at step two once a new context has been identified, says nothing about whether such remedies are excluded from the new context analysis. The question is whether step one consideration of alternative remedies is affirmatively foreclosed. *Egbert* does not "clarif[y]" that courts must turn

a blind eye to alternative remedies at *any* step of the *Bivens* analysis.[3]  *Watanabe*, 115 F.4th at 1042 (citation omitted).

Indeed, *Egbert* held that the two steps, while doctrinally significant, are not theoretically distinct.  *See Egbert*, 596 U.S. at 502 (Gorsuch, J., concurring in the judgment) (noting that the Court's decision clarified the relationship between the first and second steps).  Both "steps" are geared towards answering the same question: "[W]hether there is any reason to think that Congress might be better equipped to create a damages remedy."  *Id.* at 492 (maj. op.).  It makes little sense, then, to say—as the majority's statement does—that "special factors" means something different at step one versus step two.  Statement at 7–8; *see Hernandez*, 589 U.S. at 124 n.3 (Ginsburg, J., dissenting) ("differences material to a new-context determination," including "'the presence of potential special factors that previous *Bivens* cases did not consider,'" "overlap with the [step two] special-factors inquiry" (quoting *Ziglar*, 582 U.S. at 140)).  Thus, nothing supports believing that alternative remedies are somehow relevant at the second step, but not the first.

Finally, *Egbert* confirmed the scope of the new context analysis.  The Court has "never offered an 'exhaustive' accounting" of what makes a context new.  *Egbert*, 596 U.S.

---

[3] The majority asserted that even if it were to consider alternative remedies at step one, we have already held that a claim like Watanabe's does not present a new *Bivens* context, even though the prisoner had access to the ARP.  *Watanabe*, 115 F.4th at 1042 (citing *Stanard v. Dy*, 88 F.4th 811, 814, 818 (9th Cir. 2023)).  But *Stanard* never elaborated on whether the ARP points to a new *Bivens* context, likely because the defendant never made that argument.  *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

at 492–93 (citation omitted). And it has not once suggested that certain factors are off limits. That is "because no court could forecast every factor that might counsel hesitation." *Id.* at 493 (cleaned up). And in at least some cases, "uncertainty alone is a special factor that forecloses relief." *Id.* Far from constricting step one, *Egbert* underscores its breadth.

The majority did violence to these principles. It first violated a core tenet of the *Bivens* analysis, concluding that because "Watanabe alleges he suffered deliberate medical indifference while incarcerated, in violation of the Eighth Amendment's proscription against cruel and unusual punishment," and because "*Carlson* dealt with the exact same issue," the "district court thus erred in dismissing Watanabe's Eighth Amendment claim." *Watanabe*, 115 F.4th at 1036. The Supreme Court forbids framing the new context question in this way. "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 589 U.S. at 103; *see also Tun-Cos v. Perrotte*, 922 F.3d 514, 524 (4th Cir. 2019) ("Arguing at so general a level . . . ignores the language of [*Ziglar*] . . . ."). Courts cannot identify a preexisting *Bivens* context by simply pointing to the Eighth Amendment and noting that *Carlson* dealt with the same type of claim.

Instead, courts must look for meaningful differences between a proposed *Bivens* claim and the Court's previous *Bivens* cases. *See, e.g.*, *Ziglar*, 582 U.S. at 139–40, 149. The majority did the opposite. It latched onto superficial similarities, downplaying the availability of alternative remedies and several other relevant distinctions. For instance, the majority concluded that differences in severity

between Watanabe's claim and the claim in *Carlson* were irrelevant to the cognizability of a *Bivens* remedy. *Watanabe*, 115 F.4th at 1041–42. The Supreme Court, however, has suggested otherwise. *See Ziglar*, 582 U.S. at 147 ("[T]he allegations of injury here are just as compelling as those at issue in *Carlson*.").

So have other circuits. The First Circuit recently affirmed the dismissal of an Eighth Amendment claim under *Bivens*, largely because the alleged mistreatment was meaningfully less severe than the mistreatment in *Carlson*. In *Waltermeyer v. Hazlewood*, a federal inmate alleged that he received inadequate medical treatment when a prison doctor declined his request for surgery to address chronic knee pain. 136 F.4th 361, 364–65 (1st Cir. 2025). Having been advised by an outside specialist who recommended deferring surgery, the doctor instead provided non-surgical treatments, including cortisone injections and pain medication. *Id.*

The First Circuit held that the plaintiff's allegations were meaningfully different from *Carlson*. *Id.* at 366–67. Unlike in *Carlson*, where "several of the treatments administered were medically contraindicated," the plaintiff received treatment consistent with doctors' recommendations. *Id.* The court also reasoned that the plaintiff had not alleged "gross inadequacy of medical care," nor did his claim involve a "wrongful death-like action" as in *Carlson*. *Id.* These relative differences in severity created a new *Bivens* context.

The allegations in *Waltermeyer* are close to the allegations in *Watanabe*. Nielsen also consulted another medical provider before giving Watanabe an intramuscular injection and over-the-counter painkillers. And as in

*Waltermeyer*, there is no evidence that Watanabe was given contraindicated treatment like the inmate in *Carlson*.  If these differences were enough to create a new context in *Waltermeyer*, they are enough to create a new context here.

The First Circuit also rejected the argument—pressed by the *Watanabe* majority and the *Waltermeyer* dissent—that severity is a merits question with no effect on the availability of a *Bivens* cause of action.  *See* Statement at 12–13; *Waltermeyer*, 136 F.4th at 371 (Breyer, J., dissenting).[4]  The court distinguished the Seventh Circuit's decision in *Brooks v. Richardson*, 131 F.4th 613 (7th Cir. 2025), on which the *Watanabe* majority relies.  The First Circuit majority explained that *Brooks* involved a total failure to treat a life-threatening medical condition, while the plaintiff in *Waltermeyer* was given some treatment for his condition. 136 F.4th at 367 n.4.  So too here.

Yet the *Watanabe* majority doubles down, proclaiming that *Waltermeyer* proves its point.  Statement at 13.  The majority recognizes that the First Circuit "found a new context because of the lesser severity of the alleged misconduct."  *Id.*  But according to the majority, the First Circuit "observed that the alleged conduct was so minor that it did not constitute a violation of the Eighth Amendment at all."[5]  *Id.*  *Waltermeyer*, the majority asserts, thus "stands for the proposition that allegations that do not establish a constitutional violation are not actionable under *Bivens*."  *Id.*

---

[4] Justice Breyer sat by designation on the First Circuit panel.

[5] The First Circuit said nothing about whether the plaintiff alleged an Eighth Amendment violation on the merits.  *Cf. Waltermeyer*, 136 F.4th at 368 ("Recognizing a judicially created cause of action based on Waltermeyer's allegations conflicts with the Court's [*Bivens*] directive[s] . . . .").

The explanation makes no sense. In the same breath, the majority argues that severity "merely inform[s] the merits of the constitutional violation," while suggesting that allegations falling short of a substantive Eighth Amendment violation are not viable under *Bivens*. Statement at 5, 13. That is the exact reasoning the majority purports to reject: collapsing the merits into whether a *Bivens* cause of action exists. *See* Statement at 12–14 & n.4. The majority's contradiction is a concession that severity bears on the cognizability of a *Bivens* remedy.

The First Circuit's analysis tracks the views of other circuits that consider severity as part of the new context analysis. In *Johnson v. Terry*, the Eleventh Circuit found "a new context under the first-stage inquiry" because "[t]he severity, type, and treatment of [the plaintiff's] injuries were different from those of the plaintiff in *Carlson*." 119 F.4th 840, 859 (11th Cir. 2024). And in *Rowland v. Matevousian*, the Tenth Circuit pointed to the lack of allegations that prison officials "act[ed] contrary to the doctor's recommendations," gave "'contra-indicated drugs,'" or used medical equipment "'known to be inoperative'" as meaningful differences from *Carlson* giving rise to a new *Bivens* context. 121 F.4th 1237, 1243 (10th Cir. 2024) (quoting *Carlson*, 446 U.S. at 16 n.1). These decisions reject the majority's conclusion that "receiv[ing] less deficient care than the inmate in *Carlson* . . . is not a meaningful difference." *Watanabe*, 115 F.4th at 1041–42 (quoting *Stanard*, 88 F.4th at 817).

In sum, the majority focused on a handful of factual similarities, glossing over the meaningful differences between this case and *Carlson*. And it did so in violation of the Supreme Court's clear instructions. The en banc court should have intervened to correct these fundamental errors.

B

The majority's alternative remedies holding also underscores a circuit split. At least two other circuits have held that the availability of alternative remedies—specifically the ARP—creates a new *Bivens* context. In *Johnson*, the Eleventh Circuit identified a new context in part because, "[a]s the [Supreme] Court found in *Ziglar*," *Carlson* "did not consider whether there were alternative remedies under the current alternative remedy analysis." 119 F.4th at 858 (citing *Ziglar*, 582 U.S. at 148). Because the plaintiff in *Johnson* could pursue an alternative remedy through the ARP, and "because the *Carlson* Court did not consider the existence of such remedies under the Supreme Court's current analytical framework," the Eleventh Circuit concluded that the plaintiff's claim arose in a new *Bivens* context. *Id.* at 858–59. The Eleventh Circuit got it right.

So did the Third Circuit. *Kalu v. Spaulding* rejected a prisoner's attempt to extend *Bivens* to cover his claim that a prison guard violated his Eighth Amendment rights by sexually assaulting him several times. 113 F.4th 311, 327 (3d Cir. 2024). The prisoner's claim "present[ed] 'features that were not considered' by the Supreme Court when deciding *Carlson*." *Id.* (quoting *Ziglar*, 582 U.S. at 148). *Carlson* bore "little resemblance" to the prisoner's case, because *Carlson* never considered the ARP, which "provides inmates with an alternative avenue for relief." *Id.* at 328. The Third Circuit concluded that the ARP, as a "feature[] that [was] not considered" in *Carlson*, presented an additional reason to conclude that the prisoner's claim arose in a new context. *Id.* (quoting *Ziglar*, 582 U.S. at 148).

Still more circuits recognize that special factors—like alternative remedies—"play a part in both steps of the

[*Bivens*] inquiry." *Sargeant v. Barfield*, 87 F.4th 358, 366 (7th Cir. 2023); *see also id.* ("At the first step, we ask whether the claim arises in a new context . . . while searching for special factors that earlier *Bivens* cases did not consider and giving special solicitude to . . . separation-of-powers concerns." (cleaned up)). That makes sense given the "overlap between the factors courts are to consider when determining whether a purported *Bivens* claim arose out of a 'new context' and whether special factors counsel hesitation for any extension of *Bivens*." *Bulger v. Hurwitz*, 62 F.4th 127, 140 (4th Cir. 2023) (citing *Egbert*, 596 U.S. at 491–92); *see Hernandez*, 589 U.S. at 124 n.3 (Ginsburg, J., dissenting) (same). Those cases are right. It makes little sense to limit certain kinds of "special factors" to *Bivens* step two, when the Supreme Court has been clear that a new context arises "when there are 'potential special factors that previous *Bivens* cases did not consider.'" *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 140).

It should come as no surprise that other circuits consider alternative remedies as part of the new context inquiry. The Supreme Court does. *See Ziglar*, 582 U.S. at 147–49; *see also Snowden v. Henning*, 72 F.4th 237, 242 (7th Cir. 2023) ("The [Supreme] Court held [in *Ziglar*] that the case represented an extension of *Bivens* to a new context" because "alternative remedies might have been available."). And the Court continues to emphasize that special factors—which include alternative remedies—are a necessary consideration at *Bivens* step one. *See Egbert*, 596 U.S. at 492. The majority ignored that guidance and held that alternative remedies are only considered at step two. That was a mistake.

The majority's statement shifts the discussion to friendlier territory, citing cases from other circuits—some

unpublished—that upheld *Carlson*-like claims. *See* Statement at 14–16. No one can dispute that courts have approved such claims, even after the Supreme Court's decisions in *Ziglar* and *Egbert*.[6] *See, e.g.*, *Brooks*, 131 F.4th at 615. After all, the Supreme Court has never expressly overruled *Carlson*, leaving some narrow, undefined area in which it may support a *Bivens* remedy. As Judge Collins explains, this case is an opportunity for the Court to clarify what, if anything, remains of *Carlson* under the current *Bivens* framework. Collins Dissent at 41, 45. And as the majority's statement only highlights, there are multiple entrenched *Carlson*-related circuit splits that deserve the Court's attention.

But I want to be clear. Considering alternative remedies—specifically the ARP—as part of the new context analysis does not "effectively overrule" *Carlson*. Statement at 17. Taking the Supreme Court at its word, *Carlson* can still support a *Bivens* claim on its facts: a wrongful death case where the remedy is "damages or nothing." *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in the judgment); *see* *Waltermeyer*, 136 F.4th at 367 (new context where the claim "does not involve a wrongful death-like action"). But when a plaintiff can use the ARP—an option not considered in

---

[6] The majority relies on cases from the Sixth Circuit, which has "questioned the [ARP's] adequacy as a *Bivens* alternative." *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 525 (6th Cir. 2020); *see Koprowski v. Baker*, 822 F.3d 248, 256–57 (6th Cir. 2016) ("[T]he ARP does not displace a *Bivens* remedy because it is not an effective substitute for a money-damages action."). Those cases predate *Egbert*, which made clear that the *Bivens* analysis does not concern itself with the adequacy or effectiveness of an alternative remedy. 596 U.S. at 497–98. But even the Sixth Circuit's cases—wrong as they are—do not hold that alternative remedies can be considered only at *Bivens* step two.

*Carlson*—Supreme Court precedent dictates that a *Bivens* cause of action is unavailable. That should come as no surprise, considering the Court has not approved an Eighth Amendment *Bivens* claim in the 45 years since *Carlson*. If one thing is clear about the Court's view of *Bivens*, it is that we should think twice before extending this "dubious authority" beyond its original facts. *See Garza v. Idaho*, 586 U.S. 232, 264 (2019) (Thomas, J., dissenting); *see also Egbert*, 596 U.S. at 502 ("[I]f we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution."). The majority would have been wise to heed this guidance.

## C

The majority also defied our circuit precedent. Two years ago, we held that where a "case involves an alternative remedial structure, [it] exists in a novel context outside the preexisting *Bivens* framework." *Harper*, 71 F.4th at 1187. David Harper, a former ranger with the Bureau of Land Management (BLM), challenged adverse employment actions taken against him by the Department of the Interior (DOI) and BLM officials. *Id.* at 1183. He alleged that the officials violated his Fifth Amendment right to due process and sought damages under *Bivens*. *Id.* at 1184. A key concern was whether Harper's claim was meaningfully different from *Davis*, the due process case where the Supreme Court recognized a *Bivens* cause of action for sex discrimination against a former congressional staffer. *Id.* at 1185, 1187; *see Davis*, 442 U.S. at 248–49.

Applying the two steps, we held that Harper's claim arose in a "meaningfully different context than past *Bivens* cases." 71 F.4th at 1186. We reached that conclusion in part because Harper, unlike the plaintiff in *Davis*, could pursue

alternative remedies. *Id.* at 1187. The Civil Service Reform Act of 1978 (CSRA) created procedures by which federal employees like Harper may challenge adverse employment actions. *Id.* Those actions can typically be appealed to the Merit Systems Protection Board (MSPB), with federal judicial review as another backstop. *Id.* (citing 5 U.S.C. §§ 7512, 7513(d), 7703(b)(1)). And should an employment action fall outside of MSPB jurisdiction, then an employee can capitalize on DOI's "own internal grievance procedures." *Id.* Much of *Harper*'s new context holding relied on these alternative remedies. And we said so: "Because this case involves an alternative remedial structure, this case exists in a novel context outside the preexisting *Bivens* framework." *Id.*

If you look for this language in *Watanabe*, you will not find it. There is no reference to *Harper* at all. The majority shunned *Harper* and its alternative remedies holding, even though the case was cited in Watanabe's reply brief and in Judge M. Smith's dissent. Indeed, the majority's statement is the first time it has said anything about *Harper*. Apparently, *Harper* was right to consider alternative remedies at step one because the CSRA was "inextricable" from the alleged constitutional violation. Statement at 11. Alternative remedies, according to the majority's overdue reading of *Harper*, can be a step one consideration if they are "part and parcel" with the alleged violation. *Id.* at 12. *Harper* says nothing of the majority's narrow rule—that alternative remedies come in at step one only if they are "inextricable from the alleged constitutional violation." *Id.*; *see Harper*, 71 F.4th at 1187. Nor does the majority identify a single case supporting its post-hoc rationalization for ignoring circuit precedent.

Instead, the majority struck out on its own, deriving its one-of-a-kind rule from *Egbert* that alternative remedies are considered only "at the *second* step of the *Bivens* analysis." *Watanabe*, 115 F.4th at 1042 (emphasis in original). The majority's holding has no basis in our precedent—or that of any other court. Our intra-circuit conflict should have been corrected en banc. *See* Collins Dissent at 40–41.

### III

The majority ignored the Supreme Court's "barely implicit" instruction: new *Bivens* claims are fated to fail. *Egbert*, 596 U.S. at 504 (Gorsuch, J., concurring in the judgment). But it went even further and fueled a circuit split, while closing its eyes to our contrary precedent. I dissent.

---

COLLINS, Circuit Judge, dissenting from the denial of rehearing en banc:

I agree with Judge Nelson that we should have taken this case en banc. As he notes, there is internal confusion within our caselaw over the role of alternative remedies in determining whether a damages claim is available under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See* R. Nelson Dissent at 38–40 (discussing *Harper v. Nedd*, 71 F.4th 1181 (9th Cir. 2023)). Moreover, with respect to the role of alternative remedies in the *Bivens* analysis, the panel here persisted in applying a relatively rigid "two step" *Bivens* analysis (under which it confined consideration of such remedies to step two), and it did so even though the Supreme Court's most recent *Bivens* case squarely held that "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a

damages remedy." *Egbert v. Boule*, 596 U.S. 482, 492 (2022); *see also id.* at 502–03 (Gorsuch, J., concurring in the judgment) (noting that the Court "recognizes that [its] two-step inquiry really boils down to a 'single question'"). These considerations, in my view, were sufficient to warrant en banc rehearing, which would have allowed us to clarify our *Bivens* precedent in a way that is more faithful to the Supreme Court's caselaw.

I concede, however, that there is a limit to how much clarity we would ultimately have been able to provide, even sitting en banc. That is because, it seems to me, there is a substantial degree of internal doctrinal tension within the Supreme Court's current *Bivens* caselaw, and that tension appears to be particularly pronounced in the context of the sort of Eighth Amendment inadequate-prisoner-medical-care claim at issue here. Perhaps this case may provide a suitable opportunity for the Court to provide a greater degree of clarity than we could ever have done in this area.

The primary difficulty here arises from the considerable tension between the Supreme Court's never-explicitly-overruled decision in *Carlson v. Green*, 446 U.S. 14 (1980), and nearly everything else the Court has said about the scope of *Bivens* over the last many years. In *Carlson*, the Court recognized an implied damages remedy against federal officials for a claim asserted by a prisoner's estate alleging that, in violation of the Eighth Amendment, the defendant officials provided the prisoner with inadequate medical care that reflected their "deliberate[] indifferen[ce] to [his] serious medical needs." *Id.* at 16 & n.1. However, essentially all of the reasoning on which the decision in *Carlson* rested has been explicitly repudiated in subsequent Supreme Court decisions, and, in addition, those decisions have created significant uncertainty as to the proper scope of

what remains of an Eighth Amendment damages remedy under *Carlson*.

In considering whether to recognize the Eighth Amendment *Bivens* action asserted in *Carlson*, the Court started from the broadly framed premise that "*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson*, 446 U.S. at 18. The Court stated, however, that this general rule could be "defeated" in either of "two situations": (1) "when defendants demonstrate 'special factors counselling hesitation in the absence of affirmative action by Congress'"; or (2) "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Id.* at 18–19 (citation omitted).

This analysis bears no resemblance to the current general standards governing *Bivens* causes of action. In contrast to *Carlson*'s starting rule that a *Bivens* cause of action presumptively exists against federal officials for constitutional violations (subject to two exceptions), the Court's current *Bivens* caselaw starts from the opposite presumption. As the Court stated in its most recent *Bivens* case, "recognizing a cause of action under *Bivens* is a *disfavored* judicial activity," because, "[a]t bottom, creating a cause of action is a legislative endeavor." *Egbert*, 596 U.S. at 491 (emphasis added) (simplified). The Court has also expressly rejected *Carlson*'s statement that a *Bivens* remedy is foreclosed by an "alternative remedy" only if Congress has "explicitly declared [it] to be a *substitute*" for that remedy. *Id*. at 501 (quoting *Carlson*, 446 U.S. at 18–19). Indeed, the Court has "indicated that if [it] were called to

decide *Bivens* today, [it] would decline to discover *any* implied causes of action in the Constitution." *Id.* at 502 (emphasis added). Put simply, both the reasoning and the result in *Carlson* are inconsistent with the "analytic framework" the Court has "prescribed" over "the last four decades of intervening case law." *Id.* at 501 (simplified).

The Supreme Court has stated, however, that "[i]f a precedent of th[e] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). But the challenge in this context is trying to ascertain when it can be said that *Carlson* "has direct application in a case."

In that regard, it is not enough that a prisoner asserts a claim of inadequate medical care under the Eighth Amendment, because the Court has made clear that the scope of a previously recognized *Bivens* remedy cannot be described with that measure of categorical breadth. *See Hernandez v. Mesa*, 589 U.S. 93, 103 (2020) ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized."). Thus, although *Bivens* itself involved several alleged Fourth Amendment violations, including one for use of excessive force, *see* 403 U.S. at 389, the Court has twice rejected particular *Bivens* Fourth Amendment excessive force claims that it deemed to arise in different contexts from *Bivens*. *See Egbert*, 596 U.S. at 494–98 (declining to recognize a *Bivens* Fourth Amendment excessive force claim due to the "national security" concerns presented by the case and the availability of alternative remedies); *Hernandez*, 589 U.S. at

103–13 (same, due to foreign affairs concerns, national security concerns, and "what Congress has done in statutes addressing related matters"). And, with respect to *Carlson* itself, the Court declined to recognize an implied damages action for an Eighth Amendment deliberate-indifference claim against a corporation managing a halfway house under federal contract, because the corporate liability context presented different considerations and because there were a variety of alternative "effective remedies." *See Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 70–74 (2001); *see also Ziglar v. Abbasi*, 582 U.S. 120, 138–39 (2017) (noting that, in *Malesko*, "the right at issue" and the "mechanism of injury" were the same as in *Carlson*, but that the *Malesko* Court nonetheless declined to allow the *Bivens* claim to proceed).

But if it is not enough that, like *Carlson*, this case involves an Eighth Amendment deliberate-indifference claim of inadequate medical treatment, when exactly does *Carlson* have "direct application in a case," such that we must apply *Carlson*, notwithstanding the wholesale evisceration of *Carlson*'s reasoning in the Court's subsequent caselaw? The Court has told us that *Carlson* does not apply if there is a "meaningful" difference between the context of *Carlson* and the claim at hand. *See Ziglar*, 582 U.S. at 139–40. A meaningful difference is present, *inter alia*, "if there are potential special factors that were not considered in previous *Bivens* cases," and such special factors (which have not been exhaustively defined) include "the existence of alternative remedies." *Id.* at 148. But if we apply this test faithfully, it is hard to see what is left of *Carlson*'s damages action. *Carlson* considered *one* alternative remedy (the Federal Tort Claims Act), but it considered that remedy's significance for a *Bivens* action

under standards the Court has since rejected, and it failed to consider many other alternative remedies that the Court has since stated may create a special context that would preclude a *Bivens* claim.  The fact that *Carlson* did not consider these other alternative remedies would seem to present a new context that defeats a *Bivens* claim, but if that contention is taken to its logical conclusion, it would hollow out *Carlson* to such a degree that there would be little, if anything, left to it.

We are thus presented with a situation in which the Supreme Court has rejected all of the premises on which *Carlson* was based; it has instructed us that the contours of what remains of *Carlson*'s cause of action are to be evaluated under the Court's *current* standards; and those standards, if faithfully applied, would seemingly finish off *Carlson* entirely.  Against this backdrop, trying to discern when the largely gutted decision in *Carlson* has "direct application in a case," and remains controlling under *Rodriguez de Quijas*, 490 U.S. at 484, is a challenging endeavor.  Perhaps this case will provide an opportunity for the Court to provide some greater clarity as to what, if anything, is left of *Carlson*.